## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

KEITH LIPTON                                          CIVIL ACTION

VERSUS                                               NO. 06-2987

N. BURL CAIN, WARDEN                                 SECTION "K"(5)

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. §2254(e)(2).  Accordingly;

IT IS HEREBY RECOMMENDED that the instant petition be **DENIED WITH PREJUDICE.**

## I.  PROCEDURAL HISTORY[1]

Petitioner, Keith Lipton, is a state prisoner currently incarcerated in the Louisiana State Penitentiary, Angola, Louisiana.  On March 23, 2000, a grand jury for Jefferson Parish returned an 11-count indictment against petitioner, along with two others, Danon Barton and James Jenkins, alleging that they committed one count of conspiracy to commit armed robbery; one count of aggravated burglary; two counts of armed robbery; one count of simple burglary; two counts of attempted armed robbery; three counts of aggravated kidnapping; and one count of possession of stolen property valued at more than $1,000.  At the arraignment on March 27, 2000, petitioner pled not guilty.  The State subsequently amended the indictment to change the aggravated kidnapping charges to three counts of armed robbery.

On July 17, 2000, petitioner withdrew his former pleas of not guilty, and pled guilty as charged to the amended indictment.[2]  The trial judge then sentenced petitioner to 49 1/2 years on each count of armed robbery, conspiracy to commit armed robbery, and attempted armed robbery.  The trial judge also sentenced petitioner to 30 years for aggravated burglary, 12 years for simple burglary, and 10

---

[1]Portions of the procedural history are taken from the Louisiana Fifth Circuit Court of Appeal's decision on direct appeal, State v. Lipton, 857 So.2d 1162, 1163-64 (La. App. 5 Cir. 2003).

[2]Petitioner pled guilty pursuant to State v. Crosby, 338 So.2d 584 (La.1976), thus reserving his right to appeal the trial court's denial of his motion to suppress.

years for possession of stolen property.  All of the sentences were ordered to be served concurrently with each other.

The State thereafter filed a multiple offender bill of information to enhance count three of the indictment (armed robbery), alleging that petitioner was a second felony offender. After being advised of his rights, petitioner stipulated to the allegations of the multiple bill.  The trial judge vacated the previous sentence and imposed an enhanced sentence of 49 1/2 years at hard labor without benefit of parole, probation or suspension of sentence.

On September 30, 2003, the Louisiana Fifth Circuit Court of Appeal affirmed petitioner's convictions and sentences, but remanded the matter "to the trial court with instructions to correct the commitment in accordance with this opinion." State v. Lipton, 857 So.2d 1162, 1167 (La. App. 5 Cir. 2003).[3]  On February

---

[3]The court explained the basis of its remand as follows:
> After imposing the original sentences, the trial judge pronounced that the "sentence is without benefit of probation, parole or suspension of sentence."  However, not all of the offenses for which [petitioner] was sentenced could be imposed without benefits.  In particular, the sentences for counts two, five and eleven (aggravated burglary, simple burglary, and illegal possession of stolen things), are illegal because the respective statutes, LSA-R.S. 14:60, 14:62(B); 14:69(B)(1), do not permit a trial judge to impose the sentences without benefit of parole, probation or suspension of sentence.  Therefore, we amend the sentences to delete the restrictions on benefits and order the trial court to correct the commitment accordingly.

20, 2004, the Louisiana Supreme Court denied petitioner's writ application.  State v. Lipton, 866 So.2d 818 (La. 2004).

Following the completion of his direct appeal proceedings, petitioner sought post-conviction relief.  Petitioner's efforts in this regard culminated on April 17, 2006, when the Louisiana Supreme Court denied his writ application.  State v. Lipton, 926 So.2d 506 (La. 2006).

In the instant federal habeas corpus action, petitioner raises the following claims: 1) Ineffective assistance of trial counsel; 2) Ineffective assistance of appellate counsel; 3) Trial court erred in denying his motion to suppress.  In its Response, the State concedes that the instant action is timely and that petitioner, as required under Rose v. Lundy, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982), has exhausted his state court remedies.  Before proceeding to the merits, the court shall review the applicable facts.[4]

According to the indictment, the crimes occurred between August 9, 1999 and August 17, 1999 in Jefferson Parish.  According to the factual basis recited by the prosecutor when petitioner pled guilty, the charges stemmed from a conspiracy between petitioner,

---

Id.

[4]The facts are taken from the Louisiana Fifth Circuit Court of Appeal's opinion, State v. Lipton, 857 So.2d 1162 (La. App. 4 Cir. 2003).

Danon Barton and James Jenkins to commit armed robberies upon Asian people leaving Wal-Mart stores, believing these people would have cash that could be readily stolen.   The prosecutor stated that around midnight on August 9, 1999, the three men followed an Asian woman and her son home, with Barton driving the car.   Petitioner and Jenkins entered the residence and robbed the occupants at gunpoint.   Some of the people in the home were beaten during this incident.

The prosecutor further stated that, at approximately midnight on August 12, 1999, the trio broke into an Asian couple's car in a Wal-Mart parking lot and stole various items from the vehicle. When the victims exited the store, Barton pulled next to them, and Jenkins and petitioner attempted to rob them at gunpoint.   The couple fled into the store, however.

The prosecutor also recounted that, on August 14, 1999, the trio followed two Asian women home from Wal-Mart.   While one of them remained outside the home, the other two men forced the women and an Asian man (Eric Tran) inside the home at gunpoint and demanded money.   The third conspirator entered the house, after which $50,000 in cash, jewelry, and a bag belonging to Mr. Tran were taken.   According to the prosecutor, Mr. Tran's bag was discarded a few blocks from petitioner's home. Further, the prosecutor stated that petitioner kept a necklace that was taken during the robbery, and the necklace was recovered after a search

of petitioner's residence.

Finally, the prosecutor stated that petitioner, Barton and Jenkins used some of the stolen money to buy new cars.  At the time of their arrests, petitioner and Barton were in "possession of cash stolen during the course of their conspiracy."

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a comprehensive overhaul of federal habeas corpus legislation, including 28 U.S.C. §2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law where there has been an adjudication on the merits in state court proceedings.

State court determinations of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. §2254(d)(1) and receive deference unless they were "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).  The United States Supreme Court has advised that:

> Under the "contrary to" clause, a federal habeas corpus court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the

> writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 1056, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); Hill, 210 F.3d at 485. Questions of fact found by the state court are "presumed to be correct ... and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Hill, 210 F.3d at 485 (quoting 28 U.S.C.§2254(d)(2)).

## III. ANALYSIS

### A.  Ineffective Assistance of Trial Counsel

The seminal Supreme Court decision regarding ineffective assistance of counsel is Strickland v. Washington, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), wherein the Court held that in order to prove that counsel was ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense.  If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

Under the deficient performance prong of the Strickland test, "it is necessary to 'judge...counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's

conduct.'" <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed. 2d 180 (1993), <u>citing</u> <u>Strickland</u>, 466 U.S. at 690, 104 S.Ct. at 2066.   To prove prejudice under the <u>Strickland</u> standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694, 104 S.Ct. at 2068.

Petitioner claims that trial counsel was not properly prepared for a July 13, 2000 motion to suppress identification hearing and therefore, his representation of petitioner at said hearing, in particular, his cross-examination of one of the victims, Ms. Supatra Bass, was unconstitutionally ineffective.   In support of this claim, petitioner asserts that counsel was unaware of the fact that Ms. Bass, in addition to identifying petitioner as a robbery suspect, had identified a second person as well.   Petitioner's assertion in this regard is incorrect.

It was established, via the prosecution's direct examination of Bass at the July 13, 2000 hearing, that she had been robbed on August 9, 1999, and that a few days thereafter, she had chosen petitioner's picture from a photographic lineup, marked as State's Exhibit 10, as one of the men who had robbed her.[5]   However, as reflected below, it was solely through defense counsel's cross-

---

[5]<u>See</u> State rec., vol. 1 of 8, pp. 157-159.

examination that Bass's identification of a second robbery suspect was established and that the State ultimately stipulated to the fact that Bass, at the same time she identified petitioner, identified a second robbery suspect.

### CROSS-EXAMINATION [OF SUPATRA BASS]

BY MR. JENKINS [DEFENSE COUNSEL]:

Q.  Well, let me ask you this.  Before you saw this set [of photographs, i.e., State's Exhibit 10], do you recall at least seeing another set before this one?

A.  Um-hum [affirmative response]....

Q.  What you're telling the Judge is that before you saw this set [State's Exhibit 10], right, you saw another set of photographs with pictures on it like this.

A.  Something like that.

Q.  Yes.  And I asked you about the back of it, and you said you wrote something on the back of another set, correct?

A.  This is the first one that I pick and he's the first one that I pick.

Q.  Okay, but you - -

A.  Okay.

Q.  Go ahead.  I'm sorry.

A.  And the other one I have my name on it but that's the second one.

**Q.  Okay, you picked a second one.**

**A.  Correct** [emphasis added]. ...

Q.  All right.  Now, we have two sets like this.  Did you sign your name on another set, if you remember?


THE COURT:

You're talking about a third set?


MR. JENKINS:

A third set.  Yes.

9

THE WITNESS:

    No.  For the third?  No....  Two only.

[MR. JENKINS:]

    Q.  Two only.  Okay.  And at that point when he showed you this set which is marked State's Exhibit 10 for the purpose of this motion, he laid it down in front of you; is that correct?

    A.  Correct.

    Q.  When he laid it down in front of you, what did he do and what did he tell you?

    A.  He just say, "You just take time - - take your time, take a look."

    Q.  Okay.

    A.  "And if you don't recognize, that's fine."

    Q.  All right.  Now, and in this particular State Exhibit Number 10, you selected someone, correct?  You picked out someone on this one?

    A.  Correct.

    Q.  And then he told you to sign your name on the back, correct?

    A.  Right.

    **Q.  Now, on the other one that you picked out, do you recall what position he was in on the photograph, the line-up?  Was he Number 1, 2, 3, 4, 5 or 6, if you recall?**

    **A.  Number 3.**

    **Q.  Number 3.  All right.  And you also signed the back of that one; is that correct?**

    **A.  Correct** [emphasis added].

    Q.  Okay....  Now, let me show you something - -

MR. ALUISE [PROSECUTOR]:

    Judge, I'm going to object to going into any other photographic line-up at this proceeding.

**MR. JENKINS:**

> **This is a motion for identification, Your Honor, and I'm just going to put on the record that - -  and I have her identify that she identified someone else on that day.**

**MR. ALUISE:**

> **Stipulate to that.**

**MR. JENKINS:**

> **Well, you'll stipulate to that?  Well -**

**MR. ALUISE:**

> **Stipulate that she identified the third picture in this line-up and signed her name to the back of it.  I've got no problem with that** [emphasis added]**....**

MR. JENKINS:

> Now, just for purposes of this hearing, this hasn't been marked, Your Honor, but we will label it as Defense Exhibit 1 for the purposes of this motion hearing.

THE COURT:

> All right.

MR. JENKINS:

> And may I approach the witness, Your Honor?

THE COURT:

> Yes.

MR. ALUISE:

> Judge, again, I object.  I don't know what the purpose of this is as to the constitutionality of this identification procedure.

THE COURT:

I'll allow it.

MR. JENKINS:

Thank you, Your Honor.

BY MR. JENKINS:

Q.  Ms. Bass, I just want you to look at this.  It's marked as Defense Exhibit Number 1 and you identified someone on this photograph, correct?

A.  Yes.[6]

Petitioner next asserts that counsel was unprepared to represent him at the July 13, 2000 hearing because counsel mistakenly believed that the second person identified by Ms. Bass was not a robbery suspect.  In support of this claim, petitioner points to counsel's alleged statement that "[t]he person whom officers showed Ms. Bass during a photographic line-up was in fact not a suspect."[7]  Petitioner asserts that if counsel had read the "Application for Search Warrant Continued", a copy of which is attached to petitioner's supporting memorandum as Exhibit E, counsel would have known that the second person identified by Ms. Bass was Ryan Henderson, an "associate" of petitioner's, and that Henderson was, in fact, a suspect in the August 9, 1999 robbery of Ms. Bass.

---

[6]See State rec., vol. 1 of 8, p. 163, lines 16-19; p. 164, lines 5-30; p. 165, lines 1-32; p. 166, lines 17-32; p. 167, lines 1-6 and lines 29-32; p. 168, lines 1-23.

[7]See Federal rec., doc. 1, petitioner's supporting memorandum at p. 9.

A reading of the pertinent portion of the hearing transcript reflects that contrary to petitioner's assertion, counsel was fully aware that the second person identified by Ms. Bass was a robbery suspect.  Counsel, by virtue of the pertinent statement, was attempting to explain to the trial judge that the second person identified by Ms. Bass was not one of petitioner's co-defendants.

Following the prosecution's stipulation to the fact that Ms. Bass had made a second identification, the trial judge expressed concern that such a discussion was taking place outside the presence of petitioner's co-defendants.  Specifically, the trial judge stated:  "I'm just real cautious about getting into testimony involving another defendant - -".[8]  In response, the following colloquy ensued:

MR. JENKINS:
    He's not a defendant, Your Honor.  This is not a suspect that he showed her.

MR. ALUISE:
    That's right.

THE COURT:
    Oh, all right.

MR. ALUISE:
    Not a defendant.  But again, stipulate to that.

---

[8]See State rec., vol. 1 of 8, p. 167, lines 7-10.

13

THE COURT:

    I thought it was another defendant.

MR. JENKINS:

    I apologize.  No, Your Honor, that's what I was getting at, that she had identified someone else at that time.[9]

Later, in questioning Ms. Bass with respect to a possible third identification, defense counsel specifically used the term "suspect" to refer to the second person identified by Bass.  "After you had identified the second **suspect**, did you see any other photos - - photographs [emphasis added]?".[10]

    Finally, in support of his claim that trial counsel was unconstitutionally ineffective, petitioner asserts that on July 17, 2000, the day he was scheduled to go to trial, counsel coerced him to plead guilty, then later coerced him to plead guilty to the multiple offender bill lodged against him.   Specifically, petitioner contends:

> [T]rial counsel informed him that he was not going to trial because he would not receive a fair trial as a black man because of the color of his skin.  [Counsel] further advised [him] that he would in fact be found guilty on all counts, not because of the facts and evidence that the State would present, but because of the color of his skin.  Trial counsel further induced the [p]etitioner to take the guilty plea by promises that if [p]etitioner pled guilty, counsel promised that he would

---

[9]<u>See</u> State rec., vol. 1 of 8, p. 167, lines 11-26.

[10]<u>See</u> State rec., vol. 1 of 8, p. 169, lines 9-11.

represent [p]etitioner in getting a time cut.  Though
[p]etitioner wanted to go to trial, he listened to the
advice of his counsel and gave an involuntary plea of
guilty, due to the promises and statements made to him by
counsel.  Trial counsel also misinformed [p]etitioner
regarding the [m]ultiple [o]ffender [b]ill....  At the
time that [p]etitioner pled guilt[y] to the [m]ultiple
[o]ffender [b]ill he was not advised by counsel that his
49-1/2 year sentence would have to be served without the
benefit of good time.[11]

In <u>Hill v. Lockhart</u> 474 U.S. 52, 58-59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985), the Supreme Court made clear "that the two-part <u>Strickland v. Washington</u> test applies to challenges to guilty pleas based on ineffective assistance of counsel."  The Court explained that in the context of guilty pleas, the first prong of the <u>Strickland</u> test is simply a restatement of the attorney competency test enunciated in <u>Tollett v. Henderson</u>, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973), and <u>McMann v. Richardson</u>, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970), namely, whether or not "counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'"  <u>Hill</u>, 474 U.S. at 56-59, 106 S.Ct. at 369-370, <u>quoting</u> <u>McMann</u>, 397 U.S. at 771, 90 S.Ct. at 1449. "The second, or 'prejudice,' requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that,

---

[11]<u>See</u> Federal rec., doc. 1, petitioner's memorandum at p. 10.

but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." <u>Hill</u>, 474 U.S. at 59, 106 S.Ct. at 370 (footnote omitted).

Petitioner, in the instant matter, cannot satisfy <u>Strickland's</u> prejudice prong since it is not reasonably probable that absent counsel's alleged coercion, he would have insisted on going to trial given the substantial evidence implicating him in the crimes. Specifically, two of the robbery victims, Supatra Bass and Supachart Uaroon, positively identified petitioner from a photographic lineup, introduced as State's Exhibit 10, as the man who had robbed them.[12] An "18 carat" necklace stolen in one of the robberies was found at petitioner's home.[13] A cell phone in petitioner's possession on August 8, 1999, was discovered the following day at one of the residences which had been robbed.[14] Further, petitioner provided Detective Daniel O'Neil with an inculpatory statement, admitting his involvement in one of the August, 1999 robberies, and stating that he had knowledge with respect to a second robbery.[15] Co-defendant, Danon Barton, likewise

---

[12] <u>See</u> State rec., vol. 1 of 8, p. 110, lines 30-32; p. 111, lines 1-32; p. 112, lines 1-27; pp. 157-159 and pp. 171-174.

[13] <u>See</u> State rec., vol. 1 of 8, p. 74, lines 26-32 and p. 75, lines 1-10.

[14] <u>See</u> State rec., vol. 1 of 8, pp. 135-149.

[15] <u>See</u> State rec., vol. 1 of 8, p. 100, lines 5-8.

implicated petitioner in the robberies, stating to Detective Mike Cunningham that petitioner had bragged about robbing "some Chinese people".[16]   Additionally, had petitioner proceeded to trial and been found guilty, he faced a term of imprisonment in excess of 500 years.[17]   By virtue of his guilty plea, petitioner received a total imprisonment term of 49 and 1/2 years.[18]

Petitioner likewise cannot satisfy Strickland's deficiency prong.   On his "Acknowledgment of Constitutional Rights and Waiver of Rights on Entry of a Plea of Guilty" form, petitioner acknowledged that no one "used any force, intimidation [or] coercion" against him or a member of his family, nor did anyone make a "promise of reward" "for the purpose of making or forcing [him] to plead guilty."[19]   At the trial of his co-defendants, petitioner swore in open court that he "pled guilty because [he] was in fact guilty and committed the crime."[20]   See generally Blackledge v. Allison, 431 U.S. 63, 74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977) ("strong presumption of verity" attaches to

---

[16]See State rec., vol. 6 of 8, pp. 33, 38.

[17]See State rec., vol. 1  of 8, p. 14.

[18]A minute entry documenting petitioner's concurrently-running sentences is contained in the State rec., vol. 6 of 8.

[19]See State rec., vol. 1 of 8, p. 15.

[20]See State rec., vol. 7 of 8, transcript of petitioner's March 15, 2001 trial testimony at p. 45, lines 10-11.

statements made in "open court").

Finally, petitioner charges that counsel was ineffective because counsel allegedly did not advise petitioner, in connection with his plea of guilty to the multiple bill lodged against him, that he would not be entitled to good time benefits. Petitioner, however, has failed to offer any proof regarding counsel's alleged lack of advice in this regard. Further, even if petitioner's allegation is correct, his good time ineligibility is considered a collateral consequence of his guilty plea, see Johnson v. Dees, 581 F.2d 1166, 1167 (5th Cir. 1978), and failure to offer advice with respect to a collateral consequence is insufficient to support a Sixth Amendment ineffective assistance of counsel claim. United States v. Banda, 1 F.3d 354, 356 (5th Cir. 1993). Additionally, petitioner cannot make the required prejudice showing since, had petitioner not entered into a plea agreement with respect to the numerous crimes with which he was charged and the multiple bill lodged against him, he faced a sentence in excess of 500 years, much longer that the 49 and 1/2 years he is presently serving without the benefit of good time.

## B. Ineffective Assistance of Appellate Counsel

To prove that appellate counsel was ineffective, petitioner must satisfy the two-prong test enunciated in Strickland v. Washington, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674

(1984), that counsel's performance was deficient and that the deficient performance prejudiced the defense.  <u>See</u> <u>Busby v. Dretke</u>, 359 F.3d 708, 714 (5th Cir.), <u>cert.</u> <u>denied</u>, 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004) (citations omitted*)* ("The familiar <u>Strickland</u> framework applies to a prisoner's claim that his appellate counsel was ineffective for failing to raise a certain issue on appeal.").  As shown below, petitioner has clearly failed to satisfy <u>Strickland's</u> prejudice prong.

First, petitioner contends that appellate counsel was ineffective because he used an incomplete transcript to prepare petitioner's appeal.  Specifically, the last portion of defense counsel's cross-examination of Detective Brian McGregor and the direct and cross-examinations of petitioner's co-defendants, Danon Barton and James Jenkins, provided in connection with a February 17, 2000 hearing on motions to suppress identification, evidence and statements, were missing because the court reporter misplaced a tape.[21]

"Due process does not require that appellate counsel have access to a 'verbatim transcript of the entire proceedings.'  <u>Karabin v. Petsock</u>, 758 F.2d 966, 969 (3rd Cir.1985).  A defendant

---

[21]The court reporter, Karla Musso, on April 15, 2002, issued a "CERTIFICATION" declaring that in transcribing the February 17, 2000 proceedings, she "discovered that the last tape of this matter was lost and could not be transcribed."  <u>See</u> State rec., vol. 3 of 8, p. 14.

bears the burden of establishing a colorable need for the missing transcript."  <u>Sulecki v. Zimmerman</u> 1988 WL 71398, *1 (E.D.Pa. 1988).  <u>See also</u> <u>Schwander v. Blackburn</u>, 750 F.2d 494, 497-498 (5th Cir. 1985) (no constitutional right to a "verbatim transcript"; relief warranted where missing witness testimony is material to errors alleged on appeal).  Petitioner has failed to establish such a need.

Additionally, on January 16, 2001, after it was discovered that a transcript for the above-described testimony was unavailable, the trial court conducted a hearing attended by petitioner, along with his counsel.  The relative insignificance of the missing testimony, vis-a-vis petitioner's "Crosby" appeal, was established at this hearing.

THE COURT:
    Good morning.

MR. FREESE:
    Your Honor, Doug Freese, here on behalf of the State of
    Louisiana.  If we could turn to Number 00-1741, "State of
    Louisiana versus Keith Lipton, et al."

THE COURT:
    Yes, sir.

MR. JENKINS:
    Your Honor, Robert Jenkins on behalf of Mr. Keith Lipton
    who is present in court.

THE COURT:

Good morning.  Let's address Mr. Lipton's case as far as his position on the transcript, the testimony on the motions.  He's got a "Crosby" plea so we need him taking a position as far as the transcript and the record that is going up.

MR. JENKINS:

Your Honor, I received the transcript this morning, and initially it was not able to be found, and I've read it, and we are ready to go forward with his "Crosby" appeal. We are okay with it.  There doesn't seem to be any problems with it.  I even read the part of Detective McGregor's testimony and it doesn't affect my "Crosby" appeal.

THE COURT:

All right.  So you are satisfied that the record is intact with the transcript, that you have seen enough and that there will be no appeal of any evidentiary matters that we've seen in this court as far as the transcript and the tapes on the transcript?

MR. JENKINS:

That's correct, Your Honor.  The most important part was the two lay witnesses who had testified and I have received those intact as I discussed with the prosecutor about it.

THE COURT:

All right.

MR. FREESE:

Correct.  What we are missing, it appears, Your Honor, is the very tail end of Mr. Jenkins' cross-examination of the police officer, and as he stated, cross-examination of a police officer on a motion to I.D. is obviously significantly less important than the testimony of the lay witnesses themselves and he has that.  Also, you know, what we don't have is the testimony of Mr. Barton and Mr. Jenkins.  Mr. Barton testified briefly during the motion hearing.  Mr. Jenkins, it was my recollection and as having been refreshed by counsel for Mr. Jenkins, that

21

he invoked the Fifth Amendment, given the way the
proceedings had progressed.

THE COURT:

    Yes, sir.

MR. FREESE:

    And I believe that there is certainly enough information
there for Mr. Lipton and his counsel to make their
decision regarding whether or not it's in Mr. Lipton's
best interest to withdraw his plea and to proceed or to
maintain the plea that has already been entered.

THE COURT:

    Do you agree with that position, Mr. Jenkins?

MR. JENKINS:

    Yes, Your Honor.  And I have had time this morning to
discuss with Mr. Lipton about it.

THE COURT:

    All right.  Then at this point we will consider Mr.
Lipton's matter, Keith Lipton's matter concluded....[22]

    Petitioner next claims that appellate counsel was ineffective

for failing to challenge Ms. Bass's identification of him as one of

the persons who robbed her and for failing to challenge the trial

court's "ruling on the 404-B Motion".[23]  Where the basis of a habeas

petitioner's ineffectiveness claim is counsel's failure to raise a

particular issue on appeal, petitioner has the burden of proving

---

[22]See State rec., vol. 2 of 8, pp. 235-237.

[23]See Federal rec., doc. 1, petitioner's memorandum at p. 12.

22

"that the appeal would have had, with reasonable probability, a different outcome if the attorney adequately addressed the issue." U.S. v. Dovalina, 262 F.3d 472, 474-475 (5th Cir. 2001) (citation omitted).  As shown below, petitioner has failed to satisfy this burden of proof.

First, petitioner claims appellate counsel should have challenged Ms. Bass's identification because Ms. Bass "had positively identified someone other than Petitioner as the perpetrator".[24]  However, as the pertinent testimony reflects, Ms. Bass identified a second person not in lieu of petitioner, but rather, in addition to petitioner.[25]

Second, Louisiana Code of Evidence Article 404(B) provides, in pertinent part:  "[E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.  It may, however be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident...."  The State sought to introduce at trial evidence that on August 8, 1999, the day before the first robbery was committed, petitioner was arrested for a traffic violation by Kenner police.  The State sought to introduce this

---

[24]See Federal rec., doc. 1, petitioner's memorandum at p. 12.

[25]See discussion supra at pp. 9-11.

evidence not to cast aspersions on petitioner's character, but rather, to identify petitioner as the person who robbed Ms. Bass. As evidenced by the following colloquy from a July 13, 2000 hearing on petitioner's motion to suppress, a Primeco cell phone registered to petitioner was discovered, after the robbery, in Ms. Bass's home.  Just eleven hours before Ms. Bass was robbed, a Primeco cell phone was returned to petitioner following his release by Kenner police officials following his August 8, 1999 traffic violation arrest.

THE COURT:

    All right.  The 404 B motion is an effort by the State to get in evidence of the traffic stop.

MR. ALUISE:

    Exactly.

THE COURT:

    At that traffic stop, was there any identification of the telephone on any level?

MR. ALUISE:

    The evidence from that stop is as follows.  There was a phone either clipped to [petitioner's] waist or [in] his pocket and it was a Primeco phone.

THE COURT:

    It was a Primeco - -

MR. ALUISE:

    He was in possession of it.

THE COURT:

Who tell[s] us that it was a Primeco phone?

MR. ALUISE:

The officer who made the stop and listed it and then handed it over to the prison and it's listed on the prison property log, the prisoner property receipt at Kenner.

THE COURT:

I'm trying to understand the importance of this testimony to the State.  There is no doubt, is there, that Mr. Lipton had subscribed to a Primeco telephone in advance of the incident?

MR. ALUISE:

That's correct.

MR. JENKINS:

Well, we are not making any admissions like that, Judge. We're just saying - -

THE COURT:

No.  I'm asking the State.

MR. JENKINS:

Okay.

MR. ALUISE:

From our perspective - -

THE COURT:

From your perspective.

MR. ALUISE:

- - yes.

THE COURT:

You know that Mr. Lipton owned a Primeco - - not owned - - subscribed to a Primeco telephone in advance of the incident; right?

MR. ALUISE:

Correct.  We have documentation to that effect.

THE COURT:

Tell me why we need to bring in traffic stops when the State has documentation that they believe shows that he had a Primeco telephone that he subscribed to?

MR. ALUISE:

The reason that we think it's important, and we do think it is vitally important, is based upon what we anticipate the defense being.  I would rather not divulge - -

THE COURT:

I'm not into divulging.  I'm into documentation which is why you are telling me - -

MR. ALUISE:

We need - -

THE COURT:

Wait.  Let me get my question out.

MR. ALUISE:

All right.

THE COURT:

Aren't you telling me that you are trying to document the fact that Mr. Lipton had a Primeco telephone that he had subscribed to and in fact he had it on him the day before the incident?

MR. ALUISE:

We are not using the 404 B incident for that purpose. The reason that the 404 B purpose is vitally important to the State is to identify which particular person was in possession of that phone on the 9th [the day of the first robbery]. So it goes to a completely different purpose and it goes to eliminate a possible claim that somebody else had that phone and left it at the scene of the crime.

THE COURT:

All we would do under that logic, isn't it, is prove that Mr. Lipton had it the day before - -

MR. ALUISE:

The day of.

THE COURT:

The traffic stop was the day of the incident?

MR. ALUISE:

The day before, but he was released from jail this subsequent day which was the day of.

THE COURT:

And the police had the telephone until then and released it to him?

MR. ALUISE:

Correct. He was basically jailed overnight from the evening of the 8th until the morning of the 9th.

THE COURT:

So you can - - using that logic, get to a point where - -

MR. ALUISE:

It puts the phone in his hand.

THE COURT:

A phone.

MR. ALUISE:

A Primeco phone.

THE COURT:

A Primeco phone in his hand in the morning.

MR. ALUISE:

Correct.

THE COURT:

Approximately what time?

MR. ALUISE:

He was released at 12:30.

THE COURT:

All right.  And sometime that evening you would argue that a Primeco phone was left at the scene of the crime?

MR. ALUISE:

That's right.  About eleven hours later, the crime was committed....  That phone was placed in [petitioner's] name three days prior to the traffic stop, four days prior to the initial crime.

THE COURT:

You can get to that point without saying anything about prior traffic offenses.

MR. ALUISE:

Sure.  Yes.  We can establish that the phone found in the victim's residence was issued to him.  No question about that.  What we need the prior traffic stop for is to place the cell phone in his possession, which is a whole 'nother question.

THE COURT:

>   And you can, via the traffic stop, you would argue and
>   the release of the phone to him the morning after the
>   traffic stop, which was the morning of the incident - -

MR. ALUISE:

>   Right.

THE COURT:

>   - - that we are involved with, you can argue that someone
>   gave him a Primeco telephone at that time and it was in
>   his possession.

MR. ALUISE:

>   Right.  And it was in his possession.  Sure....[26]

Thereafter, the trial court ruled as follows:

THE COURT:

>   I will deny the 404 B motion and allow the State to
>   introduce the evidence that they have attempted to
>   introduce.

MR. ALUISE:

>   You mean deny the defense's objection to it?

THE COURT:

>   Yes, sir.[27]

Based upon the above, this court finds that had appellate

counsel challenged the trial court's "ruling on the 404-B motion",

---

[26]See State rec., vol. 1 of 8, p. 144, lines 11-32; pp. 145-149;
and p. 150, lines 1-7.

[27]See State rec., vol. 1 of 8, p. 155, lines 15-22.

it is not reasonably probable that the appeal would have had a different outcome.   Accordingly petitioner is not entitled to habeas corpus relief.

**C.  Trial Court Erred in Denying Motion to Suppress**

Petitioner argues that the trial court erred in denying his motion to suppress evidence seized from 1960 Elizardi Street and 13720 Pierre Court because the applications for warrants to search these residences lacked sufficient probable cause.[28]   This court, however, need not address the merits of the above argument due to the mandate enunciated in <u>Stone v. Powell</u>, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).   In <u>Stone</u>, the United States Supreme Court concluded:

> [W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

<u>Id</u>. at 481-482, 96 S.Ct. at 3046 (footnote omitted).

In interpreting <u>Stone</u>, the Fifth Circuit has opined that an

---

[28]The above argument is set forth in petitioner's brief filed in support of his state direct appeal, a copy of which is attached to the instant petition as appendix A.   In the instant habeas application, petitioner states that he "adopts the entire pleadings, arguments, and authorities ... submitted and articulated by his appellate counsel on direct appeal and attached hereto as appendix (A & B)."   <u>See</u> Federal rec., doc. 1, petitioner's supporting memorandum at p. 7.

"opportunity for full and fair litigation" means just that: "an opportunity." Janecka v. Cockrell, 301 F.3d 316, 320 (5th Cir. 2002), cert. denied, 537 U.S. 1196, 123 S.Ct. 1264, 154 L.Ed.2d 1034 (2003)(citing Caver v. Alabama, 577 F.2d 1188, 1192 (5th Cir. 1978)). Even if a defendant fails to take advantage of his opportunity to litigate his motion to suppress, the fact that the opportunity was there suffices for the Stone bar to apply. Janecka, 301 F.3d at 320. Furthermore, the Fifth Circuit has held that the Stone bar applies despite an error by the state court in deciding the merits of a Fourth Amendment claim. Swicegood v. Alabama, 577 F.2d 1322, 1324-1325 (5th Cir. 1978).

In the present matter, petitioner does not contend that he was deprived of the opportunity to litigate his Fourth Amendment claim fully and fairly in the state court system. Rather, his argument addresses his dissatisfaction with the ultimate ruling which he received. Clearly, the record reflects that a motion to suppress was filed and an evidentiary hearing was held on the matter on February 17, 2000.[29] On appeal, the Louisiana Fifth Circuit addressed petitioner's Fourth Amendment concerns logically and in depth, rejecting the claim and affirming his conviction. Lipton,

---

[29]A transcript of the hearing on the motion to suppress evidence is contained in the State rec., vol. 1 of 8, pp. 56-119. As noted earlier, the court reporter, Karla Musso, misplaced a tape from the February 17, 2000 hearing and, for this reason, the transcript is incomplete. See discussion supra at p. 19, n.21.

857 So.2d at 1164-1167.   Lastly, the Louisiana Supreme Court addressed petitioner's arguments, albeit by rejecting them, in denying his writ.  <u>Lipton</u>, 866 So.2d 818.

In short, petitioner's Fourth Amendment claim is not properly before the court because the requirements set forth in <u>Stone</u> have been met through state court proceedings.

<b><u>RECOMMENDATION</u></b>

It is therefore RECOMMENDED that the petition of Keith Lipton for habeas corpus relief be DENIED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this <u>15th</u> day of ____<u>June</u>____, 2007.

ALMA L. CHASEZ
United States Magistrate Judge

32